251473 United States Sportsmen Alliance Foundation et al. v. Centers for Disease Control and Prevention et al. Arguments not to exceed 15 minutes per side. Mr. Gene for appellants. May it please the court. Good afternoon, your honors. I am Michael Gene on behalf of the plaintiff's appellants here. Federal law requires that when agencies engage in rulemaking, the rules must be found in both law and reason. And the CDC did not follow that edict here. It stretched the statute beyond what it can bear. It's legal conclusions and reasonings are not sound at all. And it did so in the name of combating a problem that does not exist. No dog has ever been imported or entered or reentered the country from a rabies-free or low-risk country with the rabies virus. It has never happened despite 900,000 dogs a year coming from these countries. And I'll start with the statute itself. May I ask, so what is the situation of the Egyptian dog that was rabid that supposedly came in through Canada? That dog weren't originated in Egypt. It did not originate in Canada. And it came through Canada with falsified vaccination paperwork. Isn't that part of the issue? I don't think so. Well, that's part of the issue. to come through rabies-free countries with animals that are from countries that have rabies. Is it your position that they're not authorized to seek to offer a remedy that protects? Not under the so-called inspection justification that they've given. What about the other measures? The other remedial measures, under the statute, the term inspection and the other remedial measures, the remedial measures inform the scope of the inspection. So we inspect the dog to look at it and figure out if it needs to be sanitized or quarantined or even put down in some way. But bans have never been authorized under the inspection powers. The Supreme Court has ruled on that in some of the case law cited in the 28J letter. But that and the Public Health Service Act incorporated the common law quarantine and inspection requirements. So what the Supreme Court has consistently said there is you can't make a ban under the guise of an inspection. You cannot ban sound and unsound items under the guise of an inspection. The one limited exception there was some of the cattle cases where the cattle infection in Louisiana was so bad that any and every cattle from that portion of Louisiana may very well have had the Texas fever, I think that they were calling it, and there was nothing else to do. But with that, Texas made an actual showing that the disease was there. And the court has been very clear that we don't like embargoes because embargoes are strong medicine. You can't really hide them behind an inspection. Can you maybe go to the text then? So I understand, I appreciate that these regulations limit the activities that your clients want to engage in. That's pretty understandable. But the statute sweeps pretty broadly. So it has all these big words, inspection, fumigation, destruction of animals, and other measures. So it seems like a pretty broad grant of power to the CDC. I know you read it differently, so why is that? I do read it differently. With the historical tradition that I just outlined, that's the basis for the inspection and the quarantine powers. This section of the Public Health Service Act is concerning quarantines and inspections. So we look at that. I mean, there's a lot more than that. There's also other measures, right? So other measures is things in addition to that. And there's also the destruction of animals, which feels like a lot more than that. It feels like a much more severe penalty than just requiring a microchip and mouth inspection. Sure, but an embargo that doesn't distinguish between sound and unsound articles is a much bigger power too. And the destruction of an animal that's found to be so infected with an infectious disease that the only thing necessary to do with it is to terminate it or destroy it is a targeted individualized measure consistent with the other remedies in Section 264A. Fumigation, sanitation, destruction. Those are all related to finding an individualized item and making what was an unsound item sound. That was the problem that the Florida court found with the mask mandate, that it didn't apply to healthy and unhealthy individuals alike. It made no effort to show who had COVID or who didn't. That's another problem with the eviction moratorium. Isn't this a much more targeted action than the masking requirement? I don't think it is much more targeted at all. Well, it certainly impacts a hugely different number of individuals, right? Well, it does impact a different number of individuals, but the distinction is whether it targets items that are known to be or at least likely to be infected with a disease. That's what the Supreme Court said. That's what some of the other more recent Title 42 cases have said. So that's, I mean, granted. What about the language in the regulation that says it's about regulations that are necessary to prevent the introduction, transmission, or spread of diseases from foreign countries into America? Sure. Isn't that the background capacity understanding of the regulation? Sure, but the second sentence informs the grant. And with that, we're talking about items that are found or likely to be infected with the disease, and then you take the appropriate sanitation measures. The other courts that have looked at this have found that we are not talking about broad public health measures here. It's finding the disease, isolating it, and then curing it in some way to make it healthy. That's the statutory scheme. And I think Section 265 would also reduce the authority here because the statutes have to be read together. Section 265 gives the CDC power to ban items in whole or in part from places where the disease is found to be present and the disease is so bad in those places that it could enter the United States. That's what it could do with Egypt or some of the other places where rabies is known to be very bad, but it went beyond that and banned it globally under the guise of an inspection. And I don't think Congress would have added that second section to require country-specific findings for certain places if they could just ban all dogs, regardless of whether they were infected or not, under the guise. They're not banning all dogs. It's just a time requirement, isn't it, and a chip requirement. So you can still import the dog as long as the dog is six months old and has complied with the chip and the ID requirement, right? The microchip and the age requirement. Yes. So it's not really a ban, isn't it? This is really just an inspection? It's not an inspection under the traditional meaning of the word. Well, I mean, these measures, the argument would be that these measures are required to assist or facilitate the inspection of the animals when they come into the country. So to that, I would say in Minnesota v. Barber, the Supreme Court rejected that. Minnesota had a law that said all meat products had to be inspected within 24 hours of being slaughtered before it could come into the state. And their reasoning, which is in that case, is that if we can't conduct this inspection, we have no idea of knowing what's healthy or not, and the Supreme Court said no. So there could be no import of the product unless there was an inspection within 24 hours? That was the Minnesota statute. Okay. But here, though, there is no, well, if there is no inspection, you cannot bring the product in, correct? So that would basically void any inspection requirement, wouldn't it, the way you're reading it? Because if you have an inspection and you don't pass the inspection, you can't come in. So that's banning the product. I read that there can be an inspection. An inspection is what the Supreme Court has told us, looking at, weighing, measuring it, and applying it to the test. But these dogs cannot pass the test because they've created a substantive ban regardless of whether they're healthy or not. Well, I mean, if they're healthy, they'll pass the inspection, won't they? And they won't be banned. No, if they're above six months or microchipped, then they'll pass the inspection. Right. But the dogs aren't being banned, though. I mean, you can get them. You just can't get them as soon as your clients would like. That's a ban on those dogs. And that's where I think. I'm finding it hard to say it's a ban because a ban means you never could get the product. Here you can get the product. It just takes a little bit longer than what you're saying it should. I presume you're saying it's your client's position that it should be the four-month wait of the old regulation or no wait at all? No, they can wait up until they were traditionally shipping the dogs in at about eight to ten weeks, about two months. That was the old regulation. Oh, I thought it was a four-month wait under the old regulation. Did you think it was just a two-month wait? That's how it operated. Okay. That was a ban for two months? Yeah. I don't know that the regulation restricted that. That was when she was shipping and transferring the dogs because they were old. The Minnesota case you cited, I don't understand the state statute. Was that a preemption case or a dormant commerce clause case? That was a commerce clause case. Dormant commerce clause case? No, I believe it was a direct regulation of interstate. Well, dormant commerce, yeah. Yeah. That just feels different in kind than what we're doing here. I don't know that it's that different because, again, these terms incorporated the traditional inspection and quarantine powers which the state had. So that's where all these terms come from. I'm struggling a little bit with why this doesn't categorize appropriately as inspections because we know that there are a number of inspections going on that qualify across the board. Historically, there have been food regulations. Everybody has to come in at a set storage temperature. There are milk product regulations. The milk products had to be pasteurized. And those, they qualify as inspections. So why wouldn't this qualify as inspection in the same way? Because those were targeted at items found to be the cause of disease, and that's what the Supreme Court said. Well, yeah, let me follow up and then give me the full answer. These, all of the items here, these inspections went on continuously for any food products that came in, even though only some of those may be found to be a problem. For the animals, they would take both of these requirements, age and chip, and they would apply it to everyone as the kind of inspection that milk has or the kind of inspection that storage temperatures have to everyone coming in. So we called those inspections. Why can't this be called an inspection? With the milk, that was responsible for, I think, 50% of some infection called S. Dublin. The turtle rule, those turtles were known to be the carriers of salmonella, responsible for 280,000 cases of salmonella a year. And the Supreme Court said that the government must make an effort to show the disease is present for it to be a valid quarantine or inspection law. Is that numbers or cost? Because one of the examples given was the Egyptian dog that was brought in and exposed a lot of other dogs that then were sent to, what, nine different states and then had to track all the people that had been in the presence of those animals or had animals who had been in the presence of those animals. And it was my understanding of the cases that it took a long time. People had to take the shots. And it cost a lot of money. Is that not a consideration that's appropriate here? The consideration comes from the statute, and it's whether the disease is present or likely to enter the country. And it's inspected for, but the CDC has foregone inspections for these dogs altogether. That's why I don't think it's an inspection. They say that in their brief. We decided to forego inspection in lieu of this standard. Okay. Thank you, Counsel. Good afternoon, Your Honors, and may it please the Court. Brian Springer on behalf of the federal government. I'd just like to take a step back and clarify what the rules are that are issued here. This case involves a conventional public health measure to prevent rabid dogs from entering the country and spreading the deadly virus to humans or to other animals. The Supreme Court and Alabama Association of Realtors recognized the long pedigree of prohibitions on the import or sale of animals known to transmit disease. And the Court explained that the CDC has the power to issue regulations that identify, isolate, and destroy communicable diseases. The age and microchip requirements are exactly those types of requirements because they help ensure that inspectors can accurately inspect dogs to check whether or not those dogs are infected with rabies when they're coming into the country. And those two requirements have an interrelationship so that they are part of the regulation as a whole and necessary to it? Is that the position? Your Honor, I think each of the requirements serves an important purpose on its own. I mean, the age requirement in particular is serving the purpose of making sure because, again, puppies often exhibit some of the symptoms of rabies, namely uncoordinated movements. And so what we don't want is an inspector to be looking at a dog and see it exhibit the uncoordinated movements and think, oh, it's just a puppy, I'll let it through because it may be that that's actually a symptom of rabies. So I think that's primarily what the age requirement's about. But it also is connected to making sure that the vaccine is effective. And then separately, the microchip requirement allows, in particular, follow-up when there's something suspicious that's revealed in the inspection. It allows you can scan the microchip and get the number and therefore match the dog in front of the inspector to the dog's paperwork. You can also use the information that you can get from putting that microchip number into certain databases. You can get information to follow-up on the importer's history and the dog's history to check whether or not this dog, although it's coming in, for example, from a low-risk country, may actually have been in a high-risk country before that. And that is what the purpose of these requirements are. Well, the CDC is seeing this regulation, including these two component parts, as necessary to effectuate their goals. That's correct, Your Honor. And, again, it's based on the experience that I think was talked about earlier, where both where there were instances where rabid dogs came into the country under fraudulent paperwork. And, separately, the CDC noted that it had numerous instances where people came to the border from a low-risk country and said, my dog has never been in a high-risk country, and it turned out that that was a lie and not true. I'm most concerned about the age requirement here, because, first of all, what was the prior regulation, the amount of time that the dog had to wait before it could come into the country? Do you know that? Your Honor, under the previous regulation, if you were coming from a high-risk country, you had to have a vaccine certificate, and you couldn't get that vaccine certificate until the dog was four months old. So, in effect, it had a four-month age requirement for dogs coming from those countries. Did that prior regulation have any requirements coming from a low-risk, say, Canada? Was there any requirement for dogs? Your Honor, there wasn't an age requirement for dogs coming from the low-risk countries. I mean, part of the reason, as the CDC explained here, so it changed the number to six months, and it explained the reason for that, it wanted to be sure it needs six months, you know, as a matter of science, to make sure that the vaccine is actually effective, and it implemented a blood test at the same time, and that's when the blood test results. Is the vaccine, though, required coming from any country, even the countries that don't have any rabies? Your Honor, the vaccine requirement really applies to the high-risk countries or where dogs have been vaccinated in high-risk countries. But what the CDC said was, look, if we set the rules differently for low-risk and high-risk countries, what that's going to incentivize people to do, as they have done in the past, is take the dogs from high-risk countries through low-risk countries. But if you have it microchipped, wouldn't you be able to tell whether it had been in the high-risk country or not? Your Honor, I think there's sort of— I guess what I'm trying to figure out is why do you need the timing requirement if you've got the microchip—if you kept the microchip, why do you also need the timing requirement? Your Honor, I think you need both, and I think the main reason is that for dogs that are coming through from low-risk countries, they go through an inspection, and the inspection is where a customs agent is looking at the dog and seeing if there are signs of rabies. Is there still a chance that you could have a dog from a high-risk country that's coming through, even with a microchip in the dog? Yes. I mean, yes, through a low-risk country, yes, that could happen and could be— and so what would happen is the customs agent might see that the dog is exhibiting uncoordinated movement, and again, that's the reason for this—one of the main reasons for the six-month requirement, and then you could take it into the back, you can scan the microchip— So the microchip really doesn't relate to whether or not the dog's been vaccinated or not. It just simply identifies who the dog is? Your Honor, it does relate to the vaccine, and the reason is that if you have to present vaccine paperwork, you could scan the microchip and get the microchip number from the dog and check to make sure that the number matches what's on the vaccine certificate in front of you. So the act of getting a microchip is not tied to getting a vaccine. It's just another requirement of something that you have to get in order to come through, right? It is—well, it is tied to—so, I mean, I guess I should separate out a couple different things, because I appreciate that this is— Yeah, maybe tie is an ambiguous term, but I'm just trying to understand factually how it works. As I understand, I mean, I have dogs, and we send them to the vet, and we have a microchip put in, but it doesn't go in because they're getting a vaccine or a rabies shot. It just goes in to identify the dog. So, Your Honor, what the rule says is that the microchip has to go in before the vaccine is given, and the reason for that is exactly what you're describing, which is that then if and when you need to check this after the fact, if you scan the microchip and get the number, you can compare it to the vaccine documentation and say, look, the numbers match, so I have more confidence that this paperwork applies to the dog that's in front of me. And again, this was all grounded in the fact that the CDC was seeing people come in with fraudulent paperwork or trying to use paperwork for one dog for a different dog, and it turned out that some of these dogs, you know, had problems or weren't adequately vaccinated. So why is it necessary—why was it necessary to increase the time from four months to six months? Because it sounded like under the old regime from even the high-risk countries, it was only a four-month wait, and now it's a six-month wait from a country that doesn't even have rabies. So, Your Honor, I want to talk—so I think the first important point, the reason that the CDC used six months, is it said it scientifically needed that to make sure that dogs that are coming from high-risk countries are adequately vaccinated, and in particular because the CDC didn't want to rely just on paperwork anymore. It started relying on blood tests, and it said you need to do the blood tests at six months to make sure that this dog has actually gotten an immunity as opposed to an infection. And then what the CDC said as well is it said, look, the problem is if we set different age requirements for low-risk countries and for high-risk countries, what will happen, which again is what the CDC had been seeing, is people will take the dogs from high-risk countries, they'll bring them through low-risk countries, and then come into the country and lie and say this dog is not, you know, hasn't been in a high-risk country. And the chipping and—the chip requirement and the other paperwork would not be enough to prevent that fraud alone. You're still concerned there may be some dogs getting through even with those requirements from the high-risk countries. Therefore, you want to have the six-month wait in order to make sure you can see visibly whether or not they have rabies. That's right, Your Honor. Usually the microchip is used as sort of a follow-up thing if there's something that's revealed from the inspection that's a problem. And so that's why the six-month requirement is also important here so that when the inspectors look at the dogs, they can see if there are signs of rabies. And if they see something that makes them worried or suspicious about either the dog or the person bringing the dog in, they can then go do the follow-up, which would usually include scanning the microchip. There's not any—what's in the record is the ability to visually inspect the dog at four months versus six months. So, Your Honor, what the CDC explained is it said that puppies, which are, you know, up to six months, just by their nature as, you know, a matter of growth, exhibit the kind of uncoordinated movement that is symptomatic of rabies. And so the CDC said you have to wait until after six months so that you can figure out whether or not, if we're seeing a dog that has uncoordinated movements, that's a sign that it has rabies. And not, you know—what we don't want is an inspector to say, oh, that's probably just a puppy, I don't need to worry about this, and wave the dog through, only to find out that that dog does, in fact, have rabies. And so that is the reason that it said it at six months. That's in step with the prior regulation, right? The 1985 regulation had you need to have a vaccine, and if you don't, you have to submit evidence satisfactory to the director that if a dog is less than six months of age, it has only been in a country determined to be rabies-free. Or C2 is if a dog is six months of age or older, it has to be certified as in a country that is rabies-free. So it just seems to me there's a continuity here. That's a little of my concern about the arguments, is that it does not seem to have altered significantly, except for to add advances in technology to be able to do what the 1985 version of this regulation did. General, I mean, I agree that this is just an incremental change, and it's right that even in the previous regime, when dogs were coming from high-risk countries through low-risk countries, if you were coming from a low-risk country, what you had to show is exactly what Your Honor described, which is that the dog had not been in a high-risk country, either for its entire life or for the past six months, depending on its age. So this isn't a big change. Instead, what the CDC was worried about was the use of paperwork that it had seen be fraudulent, so it came up with other ways to sort of check and make sure that we're not letting dogs slip through the cracks and come into the country when, in fact, they have rabies. I think I know the answer to this question, but I want to ask you to make sure. There's no way you can check a dog to see whether it's had a rabies vaccination. Is that correct? Like through a blood draw or something that would show that it had been given the vaccine? Your Honor, you can do a blood test. That's what the agency required for the dogs that have been vaccinated in foreign countries. Oh, so you can do one? I mean, in the same way that humans can be checked to make sure that they have the antibody treatment. I didn't realize you could. I thought maybe you wouldn't know until after the dog had died whether it had rabies. I guess whether it had rabies, you wouldn't be able to tell. Sorry, yeah, I suppose really what I'm talking about. I think the blood draw might also show if you have an infection for rabies, but what it's used for is to check whether or not this dog is immune against rabies and has the right antibody response. Wasn't there something about a long incubation period that was problematic for finding a way to actually test for rabies? Because the incubation period significantly varies, and so you take someone in who tests fine right now for rabies, as Judge Bush asked, but that may beg the question. That's exactly right. I mean, and the agency specifically described part of the reason for adding, you know, before it had sort of what looked like a four-month requirement, it added the extra two months specifically for the reason that there's a long incubation period and it wanted to make sure that we're not letting dogs in that we think are fine and it turns out that they do actually have rabies. Can I ask you two questions about the statutes? So there's some reference to both 264 and 265. Am I right that the government's relying exclusively on 264? Your Honor, the district court here said that 264 gives the CDC the authority to issue this. That's a different question. You're not relying on 265? In other words, that could be an alternative basis to affirm, but you're not relying on 265? Your Honor, we haven't invoked it in our brief in the case. Okay. So with respect to 264, the measures we're talking about, are you characterizing them as inspections or as other measures or something else? Your Honor, I think you could put it either under inspection measures or under other measures. How would you put it? As what? Inspection or what? As inspection or in the other measures category. How do you describe? I mean, there's got to be some limiting principle on other measures, right? Your Honor, I mean, I guess I'd give you a couple of responses to that. I mean, I think first of all, as I've said, I mean, I think this fits into an inspection measure. This looks just like, you know, facilitating inspections and that's the whole purpose of this. But even if you sort of thought inspection didn't cover it, I think what other measures does, which is the way the Supreme Court. You're inspecting for a microchip, I guess, in a way? Your Honor, I mean, I guess. You're self-inspecting for a disease, but you're kind of inspecting for a microchip in a sense. Your Honor, I mean, I think the way I would describe it is that without these requirements, we're worried that the inspections won't be effective, and so they're integral to the inspections. Do you have an example of another product being imported where the CDC requires a change in the product in order to facilitate the inspection? Because here there is arguably a change in the product. You're having a couple of things happen. You're having a chip put into the product, i.e. the dog, and you're also having time as a factor because you're not getting a four-month-old puppy or two-month-old puppy. You're getting a six-month-old adult dog. So that's a change in the product, you could say. So do you have an example of the CDC ever having required that the product change itself in some way in order to pass an inspection? Your Honor, I mean, nothing in particular is coming to mind, although our brief talks about a number of different prophylactic and other measures that the agencies have taken. I mean, I guess maybe what I would point the Court to— I was thinking of, like, labeling. Do you have any example where the CDC has required, like, labeling to go on a packaging of a product or, say, a bottle of milk needed to be clear or something in order to inspect it? Is there anything in the history of the CDC that they've ever required a change in a product's packaging or its makeup or anything about it in order for it to be inspected under 264? Your Honor, there are examples, I think, of FDA in particular using the 264A authority related to inspections about, you know, pasteurization of milk. I don't kind of know exactly something that fits exactly what you're describing, although I would also point the Court to— and again, this was cited with approval in the Supreme Court's decision— the ban on small turtles coming into the country for sale, and that was specifically about the worry that certain small turtles carried salmonella. But you didn't require, you know, mutation in the turtle or anything. I mean, you just say you can't bring it in. But it made it—it applied to a certain set of turtles that, you know, there was worry that they would bring salmonella in, and so those turtles just couldn't come in at all. So I think this is an even less drastic measure than that. Just on the question I was asking about the statutory terms. So as other measures, is that doing any work for you all in this case, or is it just all clearly under the inspection category? Your Honor, I mean, again, we think that we fit in the inspection category. I think even if you thought we didn't, the other measure sort of allows for things that are similar to the things that are listed. And I think what I would point the Court to is the way the Supreme Court described this language in Alabama Association of Realtors. What it said is that these are measures, you know, that are directly targeting the disease by identifying, isolating, or destroying the disease itself. And that's exactly what the age and microchip requirements are doing, is making sure that we don't let rabid dogs come into the country and spread the virus to others. Okay. Thank you very much. Thank you, Your Honors. Thank you, Your Honors. I'll move to the arbitrary and capriciousness nature of the rule. The whole purpose of the rule is around the rabies vaccine. A six-month requirement was always about counting the dog's teeth to know it was old enough to have received the vaccine. The microchip, it's always about comparing the microchip number to the vaccine paperwork at the border. Then they drop the vaccine requirement for these countries. They drop the paperwork requirement altogether. These are for the non-high-risk countries. For the low-risk and the rabies-free countries. There's no vaccine requirement. There's not even a paperwork requirement anymore. Well, isn't there a form that has to be filled out? There is. It collects information? Yes. But in the declaration the CDC submitted, the microchip number is neither required nor optional on that form. And that form is administrative in nature. It's never seen by a human being. This is in the final rule itself. And all the person has to do is submit the receipt that they filled out the form and put it in. It does not ask for any vaccine or any medical records whatsoever. So these are all around the vaccine. That's not required. And they're not checking it to begin with. That, I think, makes this very arbitrary and capricious. The other argument, uncoordinated movement, that never appeared in the proposed rule once. That appeared in the final rule in response to comments. The CDC has the obligation to tell the people what the justifications for the rule are in the proposed rule so the people can comment on it and the final rule. No, that's quite right, is it? I mean, that's the purpose of the comment, period, for them to understand whether the rule is valid or not. It seems like, to me, rationales given in response to comments ought to be as valid as the rationales given when you propose the rule. Why should that be any different? It's a different rationale. The original rationale was we need to count the teeth to know if the dog's old enough to have been vaccinated. The new rationale is it might display uncoordinated movement and, therefore, it might be difficult to actually. . . But we still look at the merits, I mean, of the rationale, I think, regardless of when it was offered. To compound on that, I would point the court to subsection J1 of the final rule where they say if the dog's not moving, then the option is to give it to a vet to inspect. So it's not inspectors who don't know puppy movement from rabies. It's an actual vet who's supposed to look at it in that case. Are you saying the rationale changed during the notice and comment period, but before the final regulation was issued? Or are you saying the government's arguing a different rationale than any rationale that's supported in the rule itself? The original rationale was always about paperwork. When you say original. . . In the proposed rule. But the final rule would have incorporated this, correct? The final rule incorporated the uncoordinated movement in response to comment. Right. Okay, well, thank you, counsel. And we'll take the matter under submission. Those are all our cases today, so the clerk may adjourn.